UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| RHONDA BECK, | Case No. 19-CV-1829 (NEB/HB) |
| Plaintiff, | |
| v. | ORDER ON MOTIONS FOR SUMMARY JUDGMENT |
| XCEL ENERGY, INC., as Plan Administrator for Xcel Energy Pension Plan, | |
| Defendant. | |

Rhonda Beck sued her employer Xcel Energy, Inc. ("Xcel"), seeking to clarify her rights to future pension benefits under the terms of the Xcel Energy Pension Plan (the "Plan"). (ECF No. 1.) Beck and Xcel have each moved for summary judgment on Beck's 29 U.S.C. § 1132(a)(1)(B) claim.[1] (ECF Nos. 15, 19.) For the reasons that follow, Beck's motion for summary judgment is denied and Xcel's motion for summary judgment is granted.

---

[1] Count II of Beck's complaint seeks attorneys' fees and costs under 29 U.S.C. § 1132(g), but neither party contends that summary judgment is proper on that claim at this stage of the proceedings.

1

## BACKGROUND[2]

Beck is a current employee of Xcel and has participated in the Plan since 1985. (*See* ECF No. 1 ("Compl.") ¶¶ 5–6; 9–13.) Xcel is the Plan's administrator and sponsor. (*Id.* ¶ 8.) In 1998, the plan changed. Plan participants were given the opportunity to choose between the "Traditional" program and the newly-created "Pension Equity" program. (*Id.* ¶ 14.) Xcel retained Willis Towers Watson ("WTW") as its consulting pension actuary to assist with the election process. (*See id.* ¶ 16; XCEL000013.)[3]

Originally, participants were instructed to make their elections by September 30, 1998. (XCEL000021.) To make their elections, participants could either complete and return a paper election form or make their selection online. (*See id.*) Employees who did not make an election during the 1998 window were given a second opportunity in June 1999. (*See id.*) According to Beck, she took no action because she could not decide what to do. (Compl. ¶ 18.) But according to the spreadsheets maintained by WTW documenting the choices of Plan participants, Beck elected to participate in the Pension Equity program. (*See, e.g.*, XCEL000270, ECF No. 24-2 at 40; XCEL000641, ECF No. 24-2 at 635; XCEL000643, ECF No. 24-2 at 716).

---

[2] The facts in this section are taken from the pleadings and documents in the administrative record of Beck's pension-benefit claim and, unless otherwise noted, are undisputed.

[3] Unless otherwise noted, citations to the administrative record appear in this Opinion and Order with the prefix "XCEL" and reference to the page number. (ECF Nos. 24, 24-1–24-4 (redacted version).)

Over the next twenty years, Xcel placed Beck in the Pension Equity program. Under this program, Beck received an increased company match in her 401(k), which would have only been available to her by participation in the Pension Equity program. (*See* XCEL000013.) Xcel also made available online tools under which Beck could have calculated her anticipated pension benefits. (*See id.*) During those twenty years, Beck did not inform anyone that she believed she should not be receiving the additional 401(k) match, or that the online calculator was wrong.

In 2018, Beck received an e-mail stating that, according to Xcel's records, she participates in the Pension Equity program and not the Traditional program. (XCEL000933.) She replied, "I am not in agreement with the . . . records that indicate I participate in the [Pension Equity program] per the attached email. Can you send me a copy of the form I would have had to fill out to choose the Pension Equity [program] when offered?" (XCEL000932.)

Xcel responded with a letter captioned "Notice of Benefit Denial" and dated May 17, 2018. (XCEL000198–200.) Xcel stated, "[t]he company has confirmed from our records that you had elected the pension equity benefit during the pension choice election period." (XCEL000199.) It attached a copy of its records. (*See id.*) Xcel also stated:

> In order for you to perfect this claim for benefits (i.e., to demonstrate that you are eligible for the traditional formula under the Plan), you would have to furnish us with information or documentation showing either that the Plan Administrator had mistakenly enrolled you in the pension equity formula or that you possess specific documents confirming your election of the traditional benefit formula.

3

(*Id.*) Beck's counsel challenged Xcel's determination that Beck was not subject to the Traditional benefit formula, asserting that Beck had no knowledge of signing any consent forms and that her spouse would have had to sign off on her election to participate in the Pension Equity program and he did not do so. (XCEL000001.)

Xcel responded to Beck's counsel by denying her request. Xcel stated that "the Plan is being administered correctly and in accordance with its terms, that documented evidence exists in the company's records that show your client made an election of Pension Equity benefits and that your client's request to be covered under the Traditional pension formula must be denied on review." (XCEL000012.) Xcel also stated that spousal consent was not required for Beck to elect to participate in the Pension Equity program. (XCEL000013.) Xcel does not have a paper copy of Beck's election, if indeed she used one, but Xcel explained it did not retain the paper copies anyway. Instead, under Xcel's practice, all elections were transferred to electronic records. (*Id.*).

Beck's counsel then requested a complete copy of Beck's pension file and confirmation "that the only document that Xcel has that is relevant to Ms. Beck's election is a copy of an electronic record" from WTW. (XCEL000016.) Xcel then provided additional documents relating to Beck's claim. (XCEL000019.) It also provided further detail about the materials considered by Xcel in rendering its decision and explained that, as it was responding to the request for Beck's claim file, it discovered additional relevant documents. (XCEL000022.) It explained that those documents, which would be made

4

available to Beck's counsel, did not alter Xcel's conclusion that Beck elected to participate in the Pension Equity program. (*Id.*)

On July 12, 2019, Beck sued Xcel, seeking to clarify her rights to future pension benefits under the terms of the Plan. (ECF No. 1.) Each party has moved for summary judgment on Beck's 29 U.S.C. § 1132(a)(1)(B) claim.

## ANALYSIS

### I. Legal Standard

Rule 56 of the Federal Rules of Civil Procedure provides that a party is entitled to summary judgment if he "shows that there is no genuine dispute as to any material fact and [he] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "material" if its resolution "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And it is "genuine" "if the evidence is such that a reasonable [fact-finder] could return a verdict for the nonmoving party." *Id.*

### II. Xcel's Determination that Beck Participates in the Pension Equity Formula

Xcel contends that it is entitled to judgment as a matter of law because it properly determined that Beck participates in the Pension Equity program based on its electronic records. Beck argues that she is entitled to judgment as a matter of law because Xcel was required to maintain a copy of her election form and failed to do so. Thus, Beck argues, without a copy of her election form, she should default to the Traditional program.

5

Resolution of this issue requires a two-step analysis. First, the Court must consider which party has the burden to prove that Beck elected to participate in the Pension Equity program. Second, the Court must assess Xcel's decision that Beck participates in the Pension Equity program in light of that burden.

### A.     *Standard of Review and Burden*

The basic law governing the standard of review applicable to Xcel's benefits determination is settled. Where the plan gives its administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan, court review is for abuse of discretion. *See Firestone Tire & Rubber Co.*, 489 U.S. 101, 115 (1989). It is undisputed that the Plan grants Xcel, as plan administrator, discretionary authority. (*See, e.g.*, ECF No. 22 ("Beck Sum. J. Mem.") at 13.) Thus, as Beck concedes, this Court would ordinarily review Xcel's determination under the abuse-of-discretion standard. (*See id.*)

But Beck contends that this is not an ordinary case. Review of Xcel's determination is complicated by Xcel's alleged failure to comply with its obligations to maintain key records under 29 U.S.C. § 1059. (*See id.* at 13–19.) Ordinarily, "a plaintiff suing for benefits under ERISA bears the burden of establishing that he is entitled to benefits." *Jones v. Kohler Co. Pension Plan*, 224 F. Supp. 3d 691, 696 (E.D. Ark. 2016) (citing *Farley v. Benefit Trust Life Ins. Co.*, 979 F.2d 653, 658 (8th Cir. 1992)). According to Beck, Xcel's failure to maintain key records shifts the burden from Beck to Xcel. (*See* Beck Sum. J. Mem. at 17–


19.) And, Beck argues, because Xcel did not retain Beck's election form, Xcel cannot meet this burden.

Assuming without deciding that a section 1059 violation would indeed shift the burden of proof from an ERISA claimant to the plan administrator, this Court concludes that such burden-shifting is not appropriate here because the record does not reflect a violation of section 1059.[4] Section 1059 requires that "every employer shall, in accordance with such regulations as the Secretary may prescribe, maintain records with respect to each of his employees sufficient to determine the benefits due or which may become due to such employees." 29 U.S.C. § 1059(a)(1). Department of Labor regulations further explain the standards. 29 C.F.R. § 2520.107-1. In relevant part, the regulations provide that:

> The record maintenance and retention requirements of [section 1059] are satisfied when using electronic media if:
>
> (1) The electronic recordkeeping system has reasonable controls to ensure the integrity, accuracy, authenticity and reliability of the records kept in electronic form;
>
> (2) The electronic records are maintained in reasonable order and in a safe and accessible place, and in such manner as they may be readily inspected or examined (for example, the recordkeeping system should be capable of

---

[4] To the extent Xcel's claims decision can be read to include a determination that Xcel did not violate section 1059, Xcel does not and cannot argue that such a legal conclusion would be entitled to any deference. (*See* ECF No. 27 at 11). After all, when "a plan's decision to deny benefits is based on its construction of existing law, the plan's interpretation of a controlling principle of law is reviewed de novo." *Meyer v. Duluth Building Trades Welfare Fund*, 299 F.3d 686, 689 (8th Cir. 2002).

>indexing, retaining, preserving, retrieving and reproducing the electronic records);
>
>(3) The electronic records are readily convertible into legible and readable paper copy as may be needed to satisfy reporting and disclosure requirements or any other obligation under Title I of ERISA;
>
>(4) The electronic recordkeeping system is not subject, in whole or in part, to any agreement or restriction that would, directly or indirectly, compromise or limit a person's ability to comply with any reporting and disclosure requirement or any other obligation under Title I of ERISA; and
>
>(5) Adequate records management practices are established and implemented (for example, following procedures for labeling of electronically maintained or retained records, providing a secure storage environment, creating back-up electronic copies and selecting an off-site storage location, observing a quality assurance program evidenced by regular evaluations of the electronic recordkeeping system including periodic checks of electronically maintained or retained records, and retaining paper copies of records that cannot be clearly, accurately or completely transferred to an electronic recordkeeping system).

29 C.F.R. § 2520.107-1(b). Once records are transferred to an electronic form that satisfies these requirements, the original paper records may generally be destroyed. 29 C.F.R. § 2520.107-1(d).

Using the standards set forth in 29 C.F.R. § 2520.107-1(b) to guide its analysis, the Court concludes that the electronic records Xcel used to inform its determination that Beck participates in the Pension Equity program satisfy section 1059. The administrative record shows that during its review of Beck's claim Xcel contacted WTW actuaries who were responsible for keeping the records. (XCEL000022.) Two current WTW actuaries who were part of the 1998 group that worked on the election process confirmed that both WTW and Xcel maintain electronic copies of each participant's election choice. (*Id.*) They

8

further confirmed that WTW and Xcel have maintained these records since 1998 in multiple electronic databases. (*Id.*)

The administrative record also reveals dialogue between Xcel and WTW to ensure the accuracy of these electronic records. For example, when WTW and Xcel noticed that there were mistakes in the codes documenting the election choices of a group of employees (not Beck) in mid-1999, they worked together to determine how those mistakes were made and how to ensure that their digital files accurately reflected employees' election choices. (*See, e.g.*, XCEL000650.)[5] Another indicator of the reliability and accuracy of Xcel's electronic records is that Xcel's spreadsheets and internal communications consistently show that Beck elected to participate in the Pension Equity program in 1998; Beck can point to no inconsistency in the way that Xcel's files record the timing or content of that choice. (*See, e.g.*, ECF No. 24-2 at 635, 716.) Beck is on the spreadsheet of participants who made an election in 1998. (*See* ECF No. 24-2 at 40.) She is not on the spreadsheet of participants who did not make an election in 1998. (*See* XCEL000380.) And on the spreadsheets showing election choices, she is consistently recorded as having chosen to participate in the Pension Equity program. (*See* ECF No. 24-2 at 635, 716.) The administrative record reveals that the requirements of 29 C.F.R. §

---

[5] The Court is unpersuaded by Beck's argument that the very existence of these mistakes undermines the accuracy and reliability of Xcel's electronic records. To the contrary, the communications between WTW and Xcel in the administrative record indicate that WTW and Xcel had controls in place to ensure the accuracy and validity of their electronic records.

9

2520.107-1(b)(1)–(5) are satisfied, rendering Xcel's electronic records sufficient under section 1059 to determine Beck's election.

The Court is not persuaded by Beck's arguments to the contrary. Among other things, Beck contends that Section 12.12 of the Plan itself required Xcel to keep Beck's completed election choice form. In relevant part, section 12.12 provides that:

> If a form or document must be filed with or received by the Committee, Employee, or Trustee, it must be actually received by the appropriate entity to be effective . . . . The absence of a document in the appropriate entity's records and files shall be conclusive and binding proof that the document was not received by the appropriate entity.

(XCEL000756.) But section 12.12 does not apply here as it is undisputed that no form or document *needed* to be submitted for Beck to make her election; employees also had the option to use an internet-based Retirement Estimator tool. (*See* XCEL000021.)

Beck also argues that section 1059 case law makes plain that Xcel had a duty to keep either the original or a copy of Beck's pension election.[6] But even Beck's cited authority cannot be read to impose such a requirement on Xcel. Most of Beck's cited cases discuss the circumstances in which employer's records are adequate to permit the calculation of benefit contributions due under ERISA. *See, e.g.*, *Combs v. King*, 764 F. 2d 818, 824–25 (11th Cir. 1985) (holding employer had statutory duty to maintain records of the number of hours worked by her employees); *Tr. of Mich. Laborers' Dist. Council Pension*

---

[6] Beck does not explain how she believes Xcel would keep the original or copy of an election choice made on a web-based application.

10

*Fund v. Van Sullen Const., Inc.*, 825 F. Supp. 165, 169 (E.D. Mich. 1993) (same); *Mich. Laborers' Health Care Fund v. Grimaldi Concrete, Inc.*, 30 F.3d 692, 695–96 (6th Cir. 1994) (same); *see also Operating Eng'rs Pension Trusts v. B & E Backhoe, Inc.*, 911 F.2d 1347, 1354 (9th Cir. 1990) (noting employer had duty to maintain records of the number of hours worked by employees). The Court finds none of these cases instructive in determining what documents section 1059 requires an employer to maintain to make determinations about employee election choices.

Of the cases Beck cites, *Low-Iacovino v. Benefit Plan Committee of Nonbargained Program of the AT&T Pension Benefit Plan*, No. CV 16-6614-AB (GJSX), 2017 WL 6541772 (C.D. Ca. Dec. 20, 2017), is the most analogous, but it does not lead to the result Beck urges. In *Low-Iacovino*, the plaintiff contested whether she had waived her right to a "joint and survivor" annuity benefit. 2017 WL 6541772, at *4. The plan administrator (AT&T) had contracted with Fidelity Workplace Services LLC ("Fidelity") to provide services for the plan, including determination of benefit eligibility and estimation of accrued benefits. *Id.* at *1. Fidelity notified the plaintiff that she was not eligible for joint and survivor annuity benefits because her husband had elected to receive his benefits in the form of a single life annuity. *See id.* at *3. After the plaintiff made a claim for survivor benefits, arguing that she did not waive her right to such benefits, Fidelity denied that claim. *Id.* It based that decision on its analysis of the pension plan, the history of payments made to

the plaintiff's husband, and a computer printout of information related to her husband's pension benefits. *Id.*

The *Low-Iacovino* court concluded it was an abuse of discretion to deny the plaintiff's claim without attempting to retrieve her waiver form from AT&T. *Id.* at *5. It emphasized that under 29 U.S.C. § 1055(c)(2), a married participant must obtain his spouse's consent in signed and notarized writing in order to waive the joint and survivor annuity form of benefit. *Id.* at *4. It also reasoned that, because of the record-keeping obligation section 1059 imposes on an employer, the waiver form likely existed in AT&T's records and AT&T would likely be able to access it. *Id.* at *5. In light of the fiduciary duty owed to the plaintiff, the court concluded that "Fidelity should have, at a minimum, made a phone call to AT&T regarding [her husband's] historical records." *Id.* at *6.

The circumstances here differ from those in *Low-Iacovino* in several key respects. First, a signed and notarized form is required to waive the joint and survivor annuity form of benefit. 29 U.S.C. § 1055(c)(2). Such formalities are not required to make an election choice. Indeed, Beck does not contest that it was proper for participants to make their elections by way of the web-based Retirement Estimator tool. Second, unlike the plan administrator and Fidelity in *Low-Iacovino*, Xcel and WTW thoroughly reviewed their records and inquired into their accuracy before Xcel made the final decision to deny Beck's claim that she participates in the Traditional program. (*See, e.g.*, XCEL000022

(describing conversation with WTW actuaries about maintenance of election choice records).)

Based on this record, Xcel did not violate section 1059, making the abuse-of-discretion standard applicable to the Court's review of Xcel's determination that Beck participates in the Pension Equity program.

### B.    *Reviewing Xcel's Determination that Beck Participates in the Pension Equity Formula*

Under the abuse-of-discretion standard of review, the Court examines whether Xcel's factual determination that Beck elected to participate in the Pension Equity program is supported by substantial evidence. *See Mitchell v. Blue Cross Blue Shield of N.D.*, 953 F.3d 529, 537 (8th Cir. 2020). Because Xcel funds the benefits that it administers, that conflict also factors into the abuse-of-discretion review. *See id.* at 538.

"Courts reviewing a plan administrator's decision to deny benefits will review only the final claims decision." *Khoury v. Grp. Health Plan, Inc.*, 615 F.3d 946, 953 (8th Cir. 2010). In so doing, courts focus on the evidence available to the plan administrator at the time of its decision and may neither admit new evidence nor consider *post hoc* rationales. *Hayes v. Twin City Carpenters*, No. 17-CV-5267 (ECT/BRT), 2019 WL 3017747, at *9 (D. Minn. July 10, 2019) (citing *Waldoch v. Medtronic, Inc.*, 757 F.3d 822, 829–30 (8th Cir. 2014)).

It is uncontested that Xcel's November 6, 2018 letter is its final claims decision. (*See* ECF No. 26 at 13.) In that letter, Xcel explained that it based its decision on Beck's continuing acceptance of the benefits she received under the Pension Equity program,

13

her failure to object to the same, and its review of records showing Beck's election. (XCEL000013.) It asserted that, because Xcel and WTW had a policy of sending confirmation statements to participants showing their election choices, Beck would have received a copy of a confirmation statement showing an election of "Pension Equity" rather than "Traditional." (*Id.*) Although the administrative record does not contain a copy of the confirmation form sent to Beck, communication between Xcel and WTW indicates that Xcel and WTW had adopted the practice of sending out such confirmation statements at least with respect to participants that made elections during the 1999 window. (XCEL000647–48.)

Xcel also explained that it had reviewed its records with respect to pension choice election, that it had determined that all elections were transferred to electronic records, and that those electronic records accurately show each participant's pension choice election. As noted above, the spreadsheets contained in the administrative record consistently show that Beck elected to participate in the Pension Equity program in 1998. (*See* ECF No. 24-2 at 40, 635, 716.)

Finally, Xcel reasoned that even if Beck did not receive such a confirmation statement, she would have received statements indicating that her 401(k) contribution was not capped at $1,400 annually, as it would have been had she been a participant in the Traditional program. (XCEL000013.) Consistent with this, the administrative record

14

indicates that as far back as 2008, Beck's annual 401(k) contributions exceeded $1,400. (XCEL000175).

In light of the foregoing, the Court concludes that Xcel's determination that Beck elected to participate in the Pension Equity program is supported by substantial evidence. In making its determination, Xcel had before it evidence of its own practices of sending statements confirming election choices to participants, years of 401(k) contributions exceeding the $1,400 cap that applies to Traditional participants, and electronic records consistently showing that in 1998 Beck elected to participate in the Pension Equity program. The only evidence it had indicating that Beck did not do so is Beck's assertion that she disagrees with the determination that she participates in the Pension Equity program. (XCEL000932.)

The Sixth Circuit considered a similarly one-sided administrative record in *Durbin v. Columbia Energy Group Pension Plan*, 522 F. App'x 341 (6th Cir. 2013). There, the parties also disputed whether the plaintiff had elected to participate in a certain pension program. *Id.* at 342. To make its determination, the plan administrator considered that the plaintiff had been mailed a confirmation letter stating he participated in one program, that its electronic records showed that he had phoned in to elect to participate in that program, that he had received annual statements referencing that program, and that the plaintiff had signed beneficiary forms that were only used in connection with that program. *Id.* at 347. It weighed this evidence against plaintiff's assertion that he had

15

elected to participate in another program by paper ballot, that the electronic records were mistaken, and that he did not understand the annual statements he received. *Id.* at 342, 347. The plan administrator concluded that its own records accurately reflected the plaintiff's election choice. *Id.* at 343, 347. The Sixth Circuit held that in making that determination, the plan administrator used a principled reasoning process and its decision was supported by substantial evidence. *See id.* at 345 (explaining the Sixth Circuit's arbitrary and capricious standard of review); *id*. at 348 (concluding the plan administrator's decision was not arbitrary and capricious).

The same is true here. *Durbin* may present a greater disparity in evidence than this case, but the disparity between the evidence supporting Xcel's position and Beck's position compels the conclusion that Xcel's position is supported by substantial evidence. Xcel did not abuse its discretion when it determined that Beck elected to participate in the Pension Equity program. That Xcel has a conflict of interest because it funds the benefits it administers does not upset this outcome; the evidence in the record is too one-sided to reach any other conclusion.[7]

## CONCLUSION

Accordingly, IT IS HEREBY ORDERED THAT:

1.   Plaintiff Rhonda Beck's motion for summary judgment on Count I of the Complaint (ECF No. 19) is DENIED;

---

[7] Accordingly, the Court need not consider Xcel's alternative argument that Beck's suit is time-barred.

2. Defendant Xcel Energy, Inc.'s motion for summary judgment on Count I of the Complaint (ECF No. 15) is GRANTED; and

3. Within thirty (30) days of the entry of this Order, the parties shall submit a brief statement explaining whether, as a result of this Court's decision as to Count I of the Complaint, Count II should be dismissed as well.

Dated: August 31, 2020

BY THE COURT:

s/Nancy E. Brasel
Nancy E. Brasel
United States District Judge